RENDERED: JUNE 28, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1393-MR

EQT GATHERING, LLC AND
EQT PRODUCTION COMPANY                 APPELLANTS

                     APPEAL FROM PIKE CIRCUIT COURT
v.                 HONORABLE EDDY COLEMAN, JUDGE
                     ACTION NO. 13-CI-00617

BIG SANDY COMPANY, L.P.                     APPELLEE

AND

NO. 2022-CA-1481-MR

BIG SANDY COMPANY, L.P.                  CROSS-APPELLANT

            CROSS-APPEAL FROM PIKE CIRCUIT COURT
v.                 HONORABLE EDDY COLEMAN, JUDGE
                     ACTION NO. 13-CI-00617

EQT GATHERING, LLC AND
EQT PRODUCTION COMPANY               CROSS-APPELLEES

** ** ** ** **

BEFORE: EASTON, ECKERLE, AND LAMBERT, JUDGES.

EASTON, JUDGE: A jury found the Appellants EQT Gathering, LLC, and EQT Production Company (we will refer to them collectively as "EQT") breached the terms of a Pipeline Easement Agreement ("Agreement") with Appellee, Big Sandy Company, L.P. ("Big Sandy") and awarded damages. After the trial, the circuit court awarded Big Sandy prejudgment and post judgment interest, as well as attorneys' fees and costs. For the reasons which follow, we affirm all but the award of prejudgment interest, and we remand that issue for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

Big Sandy owns thousands of acres of property in Pike County. For some acres, it owns the surface rights, while on others, it owns only the mineral rights. Big Sandy leases its property to coal mining companies, who then mine the coal and pay royalties to Big Sandy. EQT is a company that produces and transports natural gas. The transport of this gas is through pipelines.

The Agreement is dated August 1, 2003. The original parties were Big Sandy and EQT's predecessor-in-interest. The Agreement allowed for transfer to EQT. The Agreement permitted installation and maintenance of an underground

-2-

pipeline across tracts of Big Sandy's property. For this purpose, both temporary construction easements and permanent easements for the pipeline and access to it were provided.

The Agreement recognized the right of Big Sandy to get the coal in the land where the pipeline was placed. If such work was done, loss of ground support could impact the pipeline. The Agreement created a process for this development. Paragraph 7 stated that if Big Sandy "has a reasonable basis to believe" that operations for underground mining "may" occur within twelve months then Big Sandy was to provide notice to EQT. Operations were not just the actual mining but also work preparatory for that purpose like building roads.

EQT could move the pipeline or purchase the unmined coal. The purchase of unmined coal presented challenges about what would need to be paid. A determination would have to be made on the amount of the coal in the ground. The purchase option, Paragraph 7(b), required each side to select an engineer to see if they could agree to the amount. If they could not do so, an "umpire" engineer could decide the amount. Due to litigation, the parties never got that far. If the amount had ever been agreed upon, the price was fixed by Paragraph 8.

On January 23, 2013, Big Sandy sent a letter to EQT which stated it had a lessee who intended to begin mining operations near the pipeline within twelve months. Big Sandy believed this letter served as sufficient notice under the

Agreement. Under Paragraph 10 of the Agreement, EQT had thirty days to make an election to either relocate the pipeline or pay for the coal.

EQT made no response to Big Sandy's notice letter until the evening of February 22, 2013. This response was an email which requested additional information. This email did not contain an election to move the pipeline or to pay for the coal in place.

Communications then took place between Big Sandy and EQT in an attempt to resolve the issue. EQT did not believe the Agreement covered three out of four tracts of property on which the pipeline was located. Big Sandy disagreed, as it believed the Agreement covered the entire portion of EQT's pipeline.

On June 7, 2013, EQT filed a Declaratory Judgment in the Pike Circuit Court. In this action, EQT asked the court for an order stating it did not have to pay to move the pipeline on tracts 1-3. Big Sandy counterclaimed for breach of contract. EQT subsequently amended its Complaint to include a claim of reimbursement for costs it claimed it incurred in its plans to relocate the pipeline.

In February 2015, the Pike Circuit Court entered a Judgment ruling the Agreement applied to the entire pipeline at issue. The circuit court denied all other motions for summary judgment, as all other rulings would have required a choice between factual determinations. This ruling that the Agreement applied to the entire pipeline was subsequently affirmed by a unanimous Kentucky Supreme

Court.  *See Big Sandy Company, L.P. v. EQT Gathering, LLC*, 545 S.W.3d 842 (Ky. 2018).

When the case returned to the circuit court, all that remained was Big Sandy's breach of contract claim, as well as EQT's claim for reimbursement of costs.  Significant discovery ensued.  The parties had considerable disagreements, including what evidence was admissible and jury instructions.

The jury trial finally began on May 2, 2022.  Many of the material facts were undisputed.  There was testimony regarding the negotiation and formation of the Agreement, as well as Big Sandy's notice letter.  Every witness generally agreed with what the terms of the Agreement were.

Chauncy Curtz ("Curtz"), who is the president of the general partner of Big Sandy, testified first.  Curtz testified that Big Sandy entered into a lease agreement with a mining company by the name of Silver Slate in July 2011.  Silver Slate would mine the coal on Big Sandy's property in exchange for royalties.  The coal seams to be mined were in the same area as the pipeline.  Over the next several months, Silver Slate worked to obtain a mining permit for this property.  In April 2012, Silver Slate's permit was "technically approved."[1]

---

[1] If a permit is "technically approved," all the application paperwork is completed.  What remains to be completed before permit issuance is to submit bonds, an affidavit of ownership, certificate of insurance, and a check for any violations.  Once "technically approved," a permit can be issued in approximately one to two months.

However, Silver Slate's mining permit was never issued. Upon final review, it was determined that an owner of Silver Slate had mining violations on another property that needed to be resolved. Silver Slate was "permit-blocked," meaning that no new mining permits would be issued to Silver Slate unless and until these violations were remedied. Silver Slate never remedied these violations.

Eric McPeek with McPeek Energy (we will refer to them collectively as "McPeek") approached Big Sandy and indicated an interest in taking over Silver Slate's lease. McPeek had a lease with Big Sandy on another piece of property, so Big Sandy was very familiar with McPeek. Curtz said that Big Sandy and McPeek had a good working relationship. It was at this point that an agreement was reached that McPeek would take over Silver Slate's lease and obtain a mining permit for this property. However, due to the location of the pipeline, it would have to be moved before any mining could safely begin. Neither McPeek nor Silver Slate yet had a valid permit to mine the coal in the affected area.

Curtz explained that it was at this point that Big Sandy sent the January 23 notice letter to EQT. EQT's response email was received at approximately 10:00 p.m. on February 22. This email did not contain an election to either move the pipeline or pay for the affected coal. The email requested an updated mining map. EQT apparently wanted more information before deciding its election despite the fact that it was out of time. Curtz was unaware of any

-6-

communication or correspondence from EQT to Big Sandy between the January 23 notice letter and the February 22 email.

Eric McPeek also testified. His company was looking for mining opportunities during this time frame. McPeek had an active lease on some other property with Big Sandy in 2013. McPeek explained it is very common in the mining industry for leases to be assigned or transferred to other contractors, and this is something he had done in the past.

McPeek remembers discussing Silver Slate's permit application and lease with Big Sandy in 2013, and he agreed that it was an opportunity in which he was interested. McPeek said the seams at issue were "great," and that he would have "loved" to mine those seams. He believed it would have been very profitable. McPeek thought he would have been able to obtain a permit in about a month or two, as Silver Slate's permit for the same project had already been technically approved, meaning most of the work had already been completed for the permit process.

McPeek did not have the issues Silver Slate had of being permit-blocked. McPeek had the workforce and equipment necessary to fulfill this lease. McPeek "for sure"[2] would have been able to begin mining within twelve months. The only hold up to begin mining was the location of the pipeline. The pipeline

---

[2] Deposition of Eric McPeek at 328.

ran through the middle of a hollow fill, which is where coal waste is disposed. Having a clear waste site is necessary before mining can begin.

McPeek was told it would be about six months if EQT elected to move the pipeline. McPeek would have been willing to wait and use that time to do other things in preparation to mine. Still, McPeek did not have a contract, lease, or agreement with Big Sandy. McPeek and Big Sandy did not proceed to negotiate taking over the lease because EQT never elected to move the pipeline.

Other witnesses called by Big Sandy confirmed this testimony. Silver Slate's permit, while "technically approved," was never issued. McPeek never had any issues obtaining mining permits. McPeek expressed interest in taking over Silver Slate's lease and obtaining a mining permit to mine this coal. Silver Slate's lease never was assigned, and McPeek never sought to obtain the permit for this mining area. All Big Sandy's witnesses testified that the reason this paperwork was not completed was because EQT did not move the pipeline, and there was uncertainty if EQT was ever going to move it. So, McPeek moved on. Further testimony will be discussed later as it becomes relevant to our analysis.

At the conclusion of evidence, the circuit court submitted the case to the jury by interrogatory. The jury returned with a verdict finding that when Big Sandy sent its notice on January 23, 2013, it had a reasonable basis to believe that within a period of no more than twelve months, it or its lessee may conduct mining

operations that would interfere with the pipeline. The jury awarded $4,841,181.33 as the amount of damages that would fairly compensate Big Sandy for coal left in place which was no longer economically recoverable at a reasonable profit as a result of EQT's election not to relocate the pipeline.

Post-trial, Big Sandy tendered its proposed Judgment and Order, which awarded them prejudgment and post judgment interest at the rate of 18%, based on the interest rate in Paragraph 20 of the Agreement. EQT objected to this award of interest, arguing Big Sandy is not entitled to prejudgment interest as the damages were not liquidated. EQT further argued the 18% interest rate listed in the Agreement does not apply to damages awarded by a jury but to specified payments. Big Sandy also filed a Motion for Attorneys' Fees and Expenses, pursuant to Paragraph 12 of the Agreement. Again, EQT objected, alleging that this provision of the Agreement was inapplicable.

The circuit court entered its Judgment and Order, which granted Big Sandy the damages awarded by the jury, prejudgment interest at the rate of 18% from February 23, 2013, until the date of judgment, attorneys' fees and expenses, and post judgment interest at the rate of 6% beginning on the date of judgment. EQT filed a Motion for Judgment Notwithstanding the Verdict ("JNOV") under CR[3] 50.02, as well as a Motion for New Trial. These motions were denied.

---

[3] Kentucky Rules of Civil Procedure.

-9-

EQT filed a Notice of Appeal outlining a list of errors it alleges the circuit court made throughout the trial. Big Sandy filed a cross-appeal regarding the percentage rate of the post judgment interest award. The parties have filed thorough briefs, and we have examined the circuit court record at length.

**ANALYSIS**
**DIRECT APPEAL**

EQT argues the circuit court made multiple errors. First, it claims it was entitled to a directed verdict or a JNOV because Big Sandy was unable to satisfy the prerequisites for the "Notice" provision under the Agreement. EQT also argues the jury instructions were improper. It alleges the circuit court made several erroneous evidentiary rulings that deprived EQT of its ability to establish a defense. Alternatively, EQT argues it was entitled to judgment as a matter of law because Big Sandy waived its breach of contract claim. Finally, they claim the circuit court erred in its award of prejudgment interest, as well as its award of costs and attorneys' fees. We will analyze these purported errors one at a time.

**I.     Directed Verdict and JNOV**

EQT's primary contention is that the circuit court should have granted a directed verdict or a JNOV on Big Sandy's breach of contract claim. "The standard of review regarding a motion for a directed verdict or JNOV has been described as a difficult one for an appellant to meet." *Est. of Moloney v. Becker*,

398 S.W.3d 459, 461 (Ky. App. 2013) (citation omitted). In *Taylor v. Kennedy*, 700 S.W.2d 415 (Ky. App. 1985), the Court described the standard of review:

> In ruling on either a motion for a directed verdict or a motion for judgment notwithstanding the verdict, a trial court is under a duty to consider the evidence in the strongest possible light in favor of the party opposing the motion. Furthermore, it is required to give the opposing party the advantage of every fair and reasonable inference which can be drawn from the evidence. And, it is precluded from entering either a directed verdict or judgment n.o.v. unless there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable [people] could differ.

*Id.* at 416. An appellate court shall not disturb a circuit court's decision on a motion for JNOV unless that decision is clearly erroneous. *Peters v. Wooten*, 297 S.W.3d 55, 65 (Ky. App. 2009). The denial of a motion for JNOV should only be reversed "when it is shown that the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice." *Id.*

EQT insists that this issue is one of law, as it involves the interpretation of Paragraph 7 of the Agreement. It therefore argues that this Court should review this issue de novo. EQT incorrectly frames this issue, as the interpretation of this provision in the Agreement is not in question.

The entirety of Paragraph 7 of the Agreement reads as follows:

If Big Sandy or its lessee(s) hereafter conduct, or Big Sandy grants a lease to conduct operations for the mining, removal or development of coal or other minerals by deep or surface mining, including the construction of roads or other operations, and **Big Sandy has reasonable basis to believe that such operations may, within a period of no more than twelve (12) calendar months**, cause an additional loss of lateral or subajacent [sic] support with respect to, or further endanger the safety of persons of the Pipeline or interfere with the construction, operation or maintenance of the Pipeline, **Big Sandy or its lessee(s) shall so notify [EQT]** by certified mail, return receipt requested (a "Notice"). Following receipt of a Notice, [EQT] shall have the option to either:

(a) relocate the Pipeline at its own expense to another suitable location, which, to the extent the same is reasonably available, shall be elsewhere on Big Sandy's Surface Tracts, in which event Big Sandy and [EQT] shall execute an Amendment to this Agreement depicting the new location of the Pipeline and Easement; or

(b) purchase Big Sandy's interest in whatever otherwise economically recoverable coal or other minerals are left in place as are reasonably necessary to preserve the lateral or subajacent [sic] support with respect to the Easement and the Pipeline in their then existing locations in accordance with any applicable law, rule, ordinance or regulation now or hereafter in force or effect, as well as any coal or other minerals in place which are no longer economically recoverable at a reasonable profit as a result of [EQT]'s decision not to relocate the Pipeline (collectively, the "Unmined Coal"). In determining the quantity of Unmined Coal for which Big Sandy shall be paid, the parties agree that (i) a fifty percent (50%) recovery factor shall be applied to all deep mineable coal left in place within the subsidence protection zone; (ii) the recovery factor

for all deep mineable coal left in place outside of the subsidence protection zone shall be determined on a case by case basis; (iii) a ninety percent (90%) recovery factor shall be applied to all surface mineable coal. The quantity of Unmined Coal for which Big Sandy shall be paid shall be determined in good faith by an engineer selected by Big Sandy and an engineer selected by [EQT]. **If they shall fail to or be unable to agree, then they shall select a disinterested coal mining engineer to act and umpire between them, and the decision made by the majority of the three shall be binding upon Big Sandy and [EQT].** In the event the engineers selected by Big Sandy and [EQT] can not [sic] agree on a disinterested coal mining engineer, the American Arbitration Association shall appoint the same, in which event the costs of the American Arbitration Association and the appointed disinterested coal mining engineer shall be shared equally by the parties.

(Emphasis added.)

The main question to be answered, and which was, in fact, answered by the jury in the affirmative, was whether Big Sandy had a reasonable basis to believe that mining operations may occur within the following twelve months. This is clearly a question of fact for a jury, not a question of law. What constitutes a "reasonable basis" is subjective, and thus within the province of the jury to decide. *See Norton Hospitals, Inc. v. Peyton*, 381 S.W.3d 286, 292-93 (Ky. 2012); *Werner Enterprises, Inc. v. Northland Ins. Co.*, 437 S.W.3d 730, 737 (Ky. App. 2014).

EQT's argument is that if Big Sandy did not have a reasonable belief that mining may occur, then its notice to EQT was not valid. If the notice was not valid, then EQT had no duty to make an election to either move the pipeline or pay for the coal. Thus, EQT could not have breached the Agreement.

EQT repeatedly claimed that the evidence was "undisputed" that Big Sandy did not have a reasonable basis to believe that its lessee may be mining in the vicinity of the pipeline within twelve months. Our review of the evidence and testimony presented at trial indicates otherwise.

Nearly every witness stated that McPeek intended to mine several seams of coal that were located in the area of the pipeline. The only witness who gave any testimony to the contrary was Raymond Merlo ("Merlo"), the owner of Silver Slate who was permit-blocked based on former violations. Merlo indicated that McPeek, after having viewed the site, declined to mine. However, this testimony was contradicted by McPeek, who testified that he and his company had every intention of mining, but for the pipeline being located where it was. Simply because the jury believed one witness over another does not entitle EQT to the outcome it seeks. "[T]his Court will not usurp the prerogative of the jury to believe a witness or set of witnesses, as opposed to another set of witnesses, and will not disturb the jury's verdict." *Rojo, Inc. v. Drifmeyer*, 357 S.W.2d 33, 35 (Ky. 1962).

EQT makes much of the fact that McPeek had not yet had Silver Slate's lease assigned to it, nor had it gotten the mining permit issued in its name. Again, almost every witness testified that assigning leases and getting permits re-issued under another name was a standard practice in the industry. Several witnesses testified that the only reason McPeek had not taken these steps was because EQT had given no indication that it was going to move the pipeline, which was a prerequisite for anyone to mine the coal in the seams in question.

There was testimony that McPeek did not want to go through the time and expense of the paperwork if the pipeline was not going to be moved. This highlights the very purpose of the timely election EQT had to make under Paragraph 7. Had EQT said it would move the pipeline instead of arguing over which parcels were subject to the Agreement, then McPeek could have moved forward in coordination with the moving of the pipeline. The documentation and paperwork could have been finalized while the pipeline was being relocated. When considering all the evidence together, it was not unreasonable for the jury to find Big Sandy had a reasonable basis to believe mining may occur within twelve months under these circumstances. The notice was valid and EQT breached the agreement by not making the election to move the pipeline under Paragraph 7.

## II. Jury Instructions

EQT next argues that the jury instructions given by the circuit court improperly stated Kentucky law. "Alleged errors regarding jury instructions are considered questions of law that we examine under a *de novo* standard of review." *Hamilton v. CSX Transp., Inc.*, 208 S.W.3d 272, 275 (Ky. App. 2006).

EQT essentially argues the circuit court's jury instructions failed to fully instruct the jury on the elements of a breach of contract claim and incorrectly instructed the measure of damages. EQT claims these errors prejudiced EQT.

The jury instructions in this case were minimal. Instructions two and three read as follows:

> Do you believe from the evidence that, on January 23, 2013, Big Sandy had a reasonable basis to believe that within a period of no more than twelve (12) months, it or its lessee may conduct mining operations that would interfere with the construction, operation, or maintenance of the pipeline?

> If you have answered "yes" to Instruction No. 2, you will determine from the evidence the amount that fairly compensates Big Sandy for coal left in place which was no longer economically recoverable at a reasonable profit as a result of EQT's decision not to relocate the pipeline, not to exceed $6,182,452.00.

EQT complains that these instructions do not require the jury to first find that a breach occurred, and that if it did, that its breach caused Big Sandy's damages.

-16-

"To prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009). EQT argues the circuit court was required to instruct the jury on all the elements of the breach of contract claim.

Kentucky has long followed the "bare bones" approach to jury instructions. "[I]t is well recognized that the function of instructions is only to state what the jury must believe from the evidence. There should not be an abundance of detail but the jury instructions should provide only the 'bare bones' of the question for the jury." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 554 (Ky. 2006).

When the case may be decided by the answering of a question, it is proper for the circuit court to submit only interrogatories. CR 49.01. This is such a case. The circuit court properly utilized interrogatories.

There was no dispute that a contract existed. Everyone acknowledged and referenced the Agreement throughout the trial. The Agreement was published to the jury as an exhibit by both parties. As far as whether a breach occurred, Instruction Number Two asked the factual question that had to be answered to determine if EQT breached the Agreement. The Agreement was very clear – if Big Sandy had a reasonable basis when they sent the notice to believe that mining

-17-

operations may occur within twelve months in an area that would interfere with the pipeline, EQT had a choice to either move the pipeline or pay for the coal that could not be mined. The conditions in the first part of that provision determines if a breach occurred. That is the exact question asked of the jury and answered by them.

EQT's next criticism of the jury instructions is that they did not explicitly require the jury to determine if the breach caused Big Sandy's damages. Again, this argument has no merit. "Damages for breach of a contract are normally that sum which would put an injured party into the same position it would have been in had the contract been performed." *Univ. of Louisville v. RAM Eng'g & Const., Inc.*, 199 S.W.3d 746, 748 (Ky. App. 2005). In this instance, the breach was EQT failing to elect to either relocate the pipeline or pay for the coal that could not be mined. Because EQT clearly did not timely elect to move the pipeline, paying for the unmined coal was the only available option.

EQT strenuously argues that no one was ever going to mine the coal. This, however, was a question for the jury, and it is closely related to the initial question of whether Big Sandy had a reasonable belief that mining may occur. While EQT argued at length that no one had a mining permit to mine these particular seams of coal, Big Sandy's witnesses testified that McPeek had every intention of mining this coal, but it was impossible to do so because of the pipeline.

As stated previously, this was a fact question for the jury to answer, and they did so. Again, we find no error.

EQT's final complaint about the jury instructions also relates to damages, and it is regarding Instruction Number Three. EQT argues that this language, which is reflective of the relevant paragraphs in the Agreement, was error. EQT argues the method of determining the amount that should be paid for unmined coal was only applicable if EQT affirmatively elected to purchase that coal. It claims it was not to be used as a method for determining damages in the event of a breach. This argument is illogical.

The options under the Agreement were to either move the pipeline or pay for the unmined coal. There was no magical third option that EQT could choose. They clearly did not timely elect to move the pipeline, so determining how much the unmined coal was worth was proper to determine damages. Big Sandy put forward an expert who described the process of estimating coal tonnage in a particular seam, and how he calculated damages from those estimates. Likewise, EQT called its own witness, who overall did not disagree with the process set forth by Big Sandy's expert.

Big Sandy's expert estimated there were 896,917 tons of coal in the

five seams of coal that McPeek wanted to mine but was unable to recover due to the pipeline. Using the price of coal in February 2013, and the royalty rate in the Agreement, Big Sandy's expert testified to a damages amount of $6,182.452.00.

EQT's expert testified that his estimate for recoverable unmined coal in the five seams was 524,924 tons. He did not dispute the price of coal used as Big Sandy's expert basis for damages. Using the same price per ton used by Big Sandy's expert, the royalty amount owed to Big Sandy using EQT's expert's coal estimate would be $3,618.301.13. The average of the two damages amounts testified to by the experts is approximately $4,900,377. The jury awarded damages in the amount of $4,841,181.33. The jury may have taken both experts' opinions into consideration and essentially split the difference, but this does not constitute error. "If the high and low estimates both have full probative value the jury necessarily must have the discretion to choose either of them or any amount between them." *Dep't of Highways v. Tyree*, 365 S.W.2d 472, 475 (Ky. 1963).

EQT argues the jury instructions automatically awarded Big Sandy the value of the unmined coal. However, the wording of the jury instructions requires the jury to determine "the amount that fairly compensates Big Sandy for coal left in place . . . *as a result of EQT's decision not to relocate the pipeline.*" (Emphasis added.) By arguing that this language requires the jury to make an award insults the intelligence of the jury. If the jury found that EQT's failure to

move the pipeline did not cause Big Sandy's damages, they had the option of awarding $0.

EQT had the option of making this argument in its closing arguments, as it knew ahead of time what the final jury instructions would be. "Our approach to instructions is that they should provide only the bare bones, which can be fleshed out by counsel in their closing arguments if they so desire." *Cox v. Cooper*, 510 S.W.2d 530, 535 (Ky. 1974). EQT continually made the argument throughout the trial that no one was going to mine this coal, and it was its responsibility to tie that point with a request for the jury to find no damages in their closing argument.

## III. Evidentiary Disputes

EQT's next argument is that the circuit court erroneously excluded much of the evidence it wished to present. "[T]he standard of review of an evidentiary ruling is abuse of discretion." *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004). EQT argues it is entitled to a new trial due to these exclusions. We disagree.

The circuit court excluded reference to almost all communications and events occurring after February 22, 2013, the date of EQT's breach. EQT argues

-21-

this evidence was relevant to show that McPeek had no mining plan for these seams, that the parties continually engaged in communications about if or where to relocate the pipeline, and that EQT began plans to relocate the pipeline but stopped those efforts after Big Sandy informed them the relocation was no longer necessary. The circuit court further ruled that it would not allow any reference to EQT's prior argument that the Agreement did not apply to the entirety of the pipeline, as the Kentucky Supreme Court had already decided this issue. The circuit court determined this evidence was either irrelevant, inadmissible under KRE[4] 408, or that it ran afoul of the Law of the Case Doctrine.

KRE 401 defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evidence which is not relevant is not admissible. KRE 402. Furthermore, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury. . . ." KRE 403.

As discussed previously, this case essentially boiled down to one question: on the date the notice letter was sent, did Big Sandy have a reasonable basis to believe mining operations may occur within twelve months which would

---

[4] Kentucky Rules of Evidence.

interfere with the pipeline? Only evidence that could shed light on this question is relevant. Therefore, the reasonable belief had to have been present on or before January 23, 2013. Nothing that occurred after could have been relevant to form the basis of their belief. What is "reasonable" must be determined "in light of the information . . . possessed at the time of the incident in question." *Turner v. Nelson*, 342 S.W.3d 866, 877 (Ky. 2011). *See also Brumley v. Commonwealth*, 413 S.W.3d 280, 285 (Ky. 2013); *Ritchie v. Turner*, 559 S.W.3d 822, 839 (Ky. 2018).

It is undisputed that EQT did not make an election to move the pipeline by the 30-day deadline outlined in the Agreement. Even if the subsequent communications between the parties had some relevance, it was not an abuse of discretion for the circuit court to exclude it to avoid confusion of the issues or based on other grounds listed in KRE 403. This is true whether the evidence is analyzed under the theory of relevance, settlement negotiations, or the Law of the Case Doctrine. Likewise, EQT's contention that Big Sandy opened the door by eliciting testimony that had already been ruled inadmissible by the circuit court has no merit. EQT's brief gives no specific testimony to support its allegations that Big Sandy opened the door to anything previously deemed inadmissible. None of the testimony EQT wished to elicit in front of the jury had any relevance to the main factual question the jury had to answer.

-23-

## IV. Waiver

In the alternative to the above arguments, EQT argues it was entitled to judgment because Big Sandy waived its breach of contract claim. "The factual findings by the trial court are reviewed under a clearly erroneous standard, and the application of the law to those facts is conducted under *de novo* review." *Cummings v. Commonwealth*, 226 S.W.3d 62, 65 (Ky. 2007). "It is the universally declared rule that what facts are necessary to create a waiver is a question of law; but, whether such facts were or not true, if denied, is a question to be determined by the jury under proper instructions . . . ." *Aetna Ins. Co. v. Weekley*, 24 S.W.2d 292, 293 (Ky. 1930).

"Waiver is commonly defined as a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon. A waiver may be either express or implied, although waiver will not be inferred lightly." *Conseco Finance Servicing Corporation v. Wilder*, 47 S.W.3d 335, 344 (Ky. App. 2001) (citation omitted).

EQT argues Big Sandy waived its strict 30-day election requirement by continuing to communicate and share information with EQT about a resolution regarding the relocation of the pipeline. There is no merit to this argument.

The language in the Agreement is clear that EQT had 30 days upon notice to make an election. The notice letter itself of January 23, 2013, contained this same language, specifically: "EQT has thirty (30) days following receipt of this Notice to elect how it chooses to proceed under Paragraph 7 of the Agreement." The testimony was undisputed that there was no communication at all between the parties until EQT sent an email on the thirtieth day which requested more information. EQT either then breached the Agreement or it did not. The jury said EQT did breach the Agreement.

Big Sandy never gave EQT any indication that it was not strictly enforcing the 30-day deadline. By the time EQT sent the email to Big Sandy on February 22, it was mere hours away from the deadline. Since no election was made in this communication, the breach occurred just hours later. EQT could not have relied on anything Big Sandy did after the fact which would have induced a breach that had previously taken place. EQT's witnesses testified that they knew what the Agreement stated and required of them as far as making an election. They agreed that no one sought out additional information or requested more time from Big Sandy until the end of the agreed upon election period. Therefore, EQT's waiver argument must fail.

## V.    Prejudgment Interest

EQT next argues that the circuit court erred in its award of prejudgment interest. Its first argument is that it was error to award prejudgment interest at all, as the damages in this matter were not liquidated. In the alternative, EQT argues that if prejudgment interest is warranted, the circuit court erred by using the contract rate of 18% annual interest.

"The longstanding rule in this state is that prejudgment interest is awarded as a matter of right on a liquidated demand, and is a matter within the discretion of the trial court or jury on unliquidated demands." *3D Enterprises Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005).

> A damages claim is liquidated if it is of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values. Examples include a bill or note past due, an amount due on an open account, or an unpaid fixed contract price. In contrast, an unliquidated damages claim is one which has not been determined or calculated, . . . not yet reduced to a certainty in respect to amount. An unliquidated claim is unspecified and undetermined prior to a breach. In determining whether a claim is liquidated or unliquidated, one must look at the nature of the underlying *claim*, not the final award.

*Ford Contracting, Inc. v. Kentucky Transp. Cabinet*, 429 S.W.3d 397, 414 (Ky.

App. 2014) (emphasis in original) (internal quotation marks and citations omitted).

We disagree with the circuit court that the damages in this case were

liquidated. While the value of coal could be simply calculated by using the market

price of coal at the time of the breach, the actual amount of unmined coal was not

so easily determined. It required experts to visit the coal seam in question and

make multiple determinations to calculate an estimate as to how much mineable

coal was present. Even the experts testified that their final estimate was just that,

an estimate. Additionally, the two qualified experts who testified in this case had

differing estimates, based on different factors taken into consideration. This

further illustrates that the damages awarded by the jury were not liquidated

damages. "[D]amages that were established by proof offered during the trial are

unliquidated and not subject to prejudgment interest." *Jackson v. Tullar*, 285

S.W.3d 290, 299 (Ky. App. 2007).

One might argue that the Agreement still resulted in liquidated

damages because of the expert process contained within the Agreement to

determine the amount of unmined coal. At this point, we must note that both sides

failed to follow through with that process. Through ten years of litigation, they

fought over the land covered by the Agreement and then the damages claimed. In

this case, the damages awarded were not liquidated.

That is not to say that it was error for the circuit court to award prejudgment interest to Big Sandy. As stated above, it is within a court's discretion to award prejudgment interest to a prevailing party based upon "equity and justice." *Church & Mullins Corp. v. Bethlehem Mins. Co.*, 887 S.W.2d 321, 325 (Ky. 1992). "In exercising its discretion, the trial court may consider 'all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him.'" *Ford Contracting*, *supra*, at 415 (citing *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 144 (Ky. 1991)). It was not an abuse of the circuit court's discretion to award prejudgment interest under the facts of this case. That, however, is a decision for the circuit court, not this Court, to make.

Because the circuit court awarded prejudgment interest based solely on the understanding that the damages were liquidated, we remand this issue for a determination of whether prejudgment interest is warranted. Because this issue remains, we must address the percentage awarded.

We agree with EQT that the circuit court erred in its application of the contract rate for prejudgment interest. KRS[5] 360.010 states that the legal rate of interest is eight percent (8%) unless a contract states otherwise. The only section of the Agreement that mentions an interest rate is paragraph 20, which states:

---

[5] Kentucky Revised Statutes.

In the event [EQT] is late in making any payment provided for in this Agreement, [EQT] shall pay to Big Sandy interest on the late payment at the rate of one and one-half percent (1 ½%) per month calculated from the date such payment became due. This provision shall in no manner limit the right of Big Sandy to declare a forfeiture of this Agreement for non-payment of amounts due.

Based on the entirety of the Agreement, this provision applies to the annual lease payments outlined in Paragraph 3 of the Agreement. While EQT cannot seriously argue that its payment to Big Sandy for unmined coal under Paragraph 7 is not "late," as this litigation has been pending for approximately eleven years, there is no specified due date of those amounts. Had EQT made the election to pay for the unmined coal rather than relocate the pipeline, Paragraph 7(b) outlines the mechanism for determining what EQT should pay, but not the timeframe in which EQT had to make these payments. The only payments set out in the Agreement with a specific "due date" are the lease payments in Paragraph 3.

Even if we were to concede the application of Paragraph 20, no payment for the unmined coal payment was "due" on a date certain. Again, because the parties litigated and did not follow the calculation method in Paragraph 7(b), there was no amount determined and thus no payment due. It became a matter of an arguable amount of damages to be determined by the trial process.

Should the circuit court, on remand, determine that prejudgment interest is warranted (which is within its discretion to do), it should apply KRS

-29-

360.010. When the damages are not liquidated, as in this case, the circuit court has considerable discretion. "The trial court may award prejudgment interest at any rate up to 8%, or it may choose to award no prejudgment interest at all, but it may not exceed the legal rate of 8%." *Fields v. Fields*, 58 S.W.3d 464, 467 (Ky. 2001). Whether any interest awarded is simple or compound interest is also within the circuit court's discretion. *Reliable Mechanical, Inc. v. Naylor Indus. Services, Inc.*, 125 S.W.3d 856, 858 (Ky. App. 2003).

## VI. Attorneys' Fees

EQT's final complaint is that the circuit court erred in awarding Big Sandy attorneys' fees. Abuse of discretion is the standard of review for the award of attorneys' fees and costs. *Alexander v. S & M Motors, Inc.*, 28 S.W.3d 303, 305 (Ky. 2000). However, "the construction and interpretation of a contract . . . are questions of law to be decided by the court," that we review de novo. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003).

"Kentucky has long followed the 'American Rule,' that in the absence of a statute or contract expressly providing therefor, attorney fees are not allowable as costs, nor recoverable as an item of damages." *Cummings v. Covey*, 229 S.W.3d 59, 61 (Ky. App. 2007). The circuit court in this case awarded Big Sandy attorneys' fees based upon Paragraph 12 of the Agreement.

EQT argues Paragraph 12 is only meant to be read as an indemnification clause, not a fee-shifting provision between the parties. Big Sandy argues the paragraph is much more expansive and includes any breach of the Agreement by EQT. The circuit court agreed with Big Sandy's interpretation and granted its requested attorneys' fees. EQT does not dispute the *amount* of attorneys' fees, but rather the *award* of them at all.

Paragraph 12 is lengthy, and it reads as follows:

[EQT] hereby covenants and agrees to conduct all of its operations hereunder in material compliance with all applicable local, State and federal ordinances, laws, statutes, rules, regulations, licenses, grants of authority or orders having jurisdiction over [EQT], its operations, the Pipeline and the Easement, and shall indemnify, defend and save harmless Big Sandy from and against any and all liabilities, obligations, damages, penalties, claims, charges, expenses, disbursements, and losses, fees and costs (including, without limitation, reasonable attorneys' fees and court costs) which may be imposed upon, incurred or suffered by, or asserted against Big Sandy, and which arise, in whole or in part, directly or indirectly, out of the use, occupancy or operation of the Easement or the Pipeline under this Agreement, or by reason of any breach of covenant or warranty on the part of [EQT] herein contained, or by virtue of any act or omission by [EQT] or its contractors, employees, agents, representatives, or any of their successors or assigns, in the course of construction, maintenance, utilization or repair of the Pipeline, or otherwise in pursuance of the terms hereof or exercise of the rights or privileges granted hereunder; provided, however, that [EQT] shall not be obligated to indemnify Big Sandy under this Paragraph to the extent [EQT] demonstrates that any

damages suffered by Big Sandy were caused by Big Sandy's own gross negligence or willful misconduct.

This provision is rather broad. When read as a whole, it is clear and unambiguous that EQT is obligated to pay Big Sandy's attorneys' fees that arose out of this litigation. While the beginning of the paragraph does use the terms "indemnify, defend, and save harmless," the later portions make clear that this paragraph is intended to cover any fees incurred by Big Sandy due to a breach by EQT.

The use of the term "or" between the provisions indicates that the parties intended to cover multiple scenarios. "[EQT] . . . shall indemnify, defend and save harmless Big Sandy from and against any and all liabilities, obligations, damages, penalties, claims, charges, expenses, disbursements, and losses, fees and costs (*including, without limitation, reasonable attorneys' fees* and court costs) which may be imposed upon, *incurred* or suffered by, or asserted against Big Sandy, and which arise, in whole or in part, directly or indirectly, out of the use, occupancy or operation of the Easement or the Pipeline under this Agreement, *or by reason of any breach of covenant or warranty on the part of [EQT]* . . . ." This particular phrasing clearly shows the parties' intention that EQT would pay any attorneys' fees incurred by Big Sandy that arose from a breach by EQT.

EQT's secondary argument that Paragraph 8 should control as being more specific than Paragraph 12 has no merit. Paragraph 8 involves the

-32-

calculation of how much Big Sandy is to be paid for unmined coal should EQT elect to pay for the coal rather than relocate the pipeline. Its indemnification provision only deals with any claim against Big Sandy by a lessee in connection with EQT's election to pay for the unmined coal. This paragraph is not inconsistent with Paragraph 12.

## CROSS-APPEAL

Big Sandy's sole issue in their cross-appeal is the circuit court's award of post judgment interest at the statutory rate of 6% instead of the contract rate of 18%. As previously discussed above, this argument has no merit because of the nature of the payment for the unmined coal having to be determined and not the type of payment contemplated by this interest provision. We affirm the award of post judgment interest at the statutory rate.

## CONCLUSION

EQT relied upon its own understanding of the provisions of the Agreement. For five years EQT argued incorrectly on what land was involved. For the next five years EQT argued over whether Big Sandy really had someone who could mine the coal within a year when Big Sandy sent the notice. In doing so, EQT gambled that it would be right in its strained interpretations of the Agreement. If EQT was wrong, it breached the Agreement and risked being held responsible for damages. EQT was repeatedly wrong in its choices. It did not

make the required election in a timely manner and must now pay the consequences of that decision.

On Appeal No. 2022-CA-1393-MR, we affirm the Pike Circuit Court's orders regarding EQT's motions for directed verdict or JNOV, jury instructions, evidentiary rulings, waiver, and granting of attorneys' fees. We reverse the award of prejudgment interest, as the damages were not liquidated. On remand, the circuit court may use its discretion to determine if prejudgment interest should be awarded to Big Sandy and in what amount. On Appeal No. 2022-CA-1481-MR, we affirm the Pike Circuit Court's award of post judgment interest at the statutory rate of 6%.

ALL CONCUR.

BRIEFS FOR
APPELLANTS/CROSS-
APPELLEES:

Candace B. Smith
Lexington, Kentucky

J. Kevin West
Columbus, Ohio

Lauren W. Varnado
Houston, Texas

BRIEFS FOR APPELLEE/CROSS-
APPELLANT:

Grahmn N. Morgan
Kristeena L. Johnson
Lexington, Kentucky

Jeremy S. Rogers
Louisville, Kentucky

David Baird
Pikeville, Kentucky